IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

ALEXANDER CHAIKIN,

              Plaintiff,

   vs.                                         Case No. 18-cv-1208

THE METHODIST MEDICAL CENTER
OF ILLINOIS,

              Defendant.

**Defendant's Motion for Protective Order
Re Depositions**

NOW COMES the Defendant, THE METHODIST MEDICAL CENTER OF

ILLINOIS, by its attorneys, QUINN JOHNSTON, and for its Defendant's Motion for

Protective Order Re Depositions pursuant to Fed. R. Civ. P. 26, 30, and 37 and the

Court's inherent authority, states:

**Introduction and Nature of the Case**

1.   Defendant Methodist Medical Center seeks a protective order addressing the

conduct of Plaintiff's counsel, Mark Lavery, regarding his conduct during the

depositions of HR professional Kathy Jaegle and hospital CEO Dr. Keith Knepp.

2.   Plaintiff's counsel repeatedly asked the same questions over and over, often

using a derisive tone. These included repeatedly asking whether Dr. Knepp was a

doctor and repeatedly asking whether a mandatory report to the Illinois Department of

Professional Regulation was retaliation.

3.   Plaintiff's counsel misconstrued or misrepresented facts as the premise for questions, asserting facts contrary even to the testimony previously given by his client, Dr. Chaikin.

4.   Attorney Lavery reinforced this misconduct with spurious allegations about Defendant's counsel.

### The Allegations of the Complaint and Surviving Claims

5.   Dr. Chaikin's initial complaint filed on June 8, 2018 asserted three claims: an ADA retaliation claim, an ADAAA discrimination claim, and a Title VII claim. Complaint [1]. Defendant filed a Motion to Dismiss [8], and Plaintiff responded by filing an Amended Complaint [11] on August 27, 2018.

6.   The Amended Complaint asserted five causes of action: an ADA retaliation claim, an ADAAA discrimination claim, and a Title VII claim (national origin discrimination), an Age Discrimination claim, and an "Intersectional Discrimination" claim.

7.   Both complaints acknowledged that the ADAAA discrimination claim had to be dismissed under 7th Circuit caselaw, because long-term leave is not a "reasonable accommodation." Complaint [1] at 4 fn 1; Amended Complaint [11] at 4 fn 1. Defendants moved to dismiss that count and the Intersectional Discrimination claim. The Court granted that motion, leaving only the ADA retaliation, age discrimination and national origin discrimination claims. Order [21].

8.  Dr. Chaikin's Amended Complaint alleges that he "met with Dr. Keith Knepp on August 4, 2017 to request a reasonable accommodation for his <u>mental health</u> disability." Amended Complaint [11] at ¶14 (emphasis added).

9.  It also alleges that he was terminated and reported to the Illinois Physician Disciplinary Board on August 7, 2017. Amended Complaint [11] at ¶16-17.

10. It alleges that he was referred to as a "Crazy Russian" and "Vitaly" by fellow employees and that the hospital was seeking to replace older doctors with younger doctors. Amended Complaint [11] at ¶17-18.

11. The remainder of the Amended Complaint [11] merely asserts the formal requirements of the relevant statutes in conclusory fashion.

12. The Complaint and Amended Complaint were filed by Attorney Mark Lavery, who withdrew as counsel in December 2018. See, Motion to Withdraw [24] and Order entered December 18, 2018. Attorney Langone entered his appearance on October 11, 2018 (Notice of Appearance [22]) and represented Dr. Chaikin until Attorney Lavery re-entered his appearance two years later in December 2020. Notice of Appearance [45].

## Deposition of Dr. Chaikin taken December 20, 2019

13. The case got off to a slow start. Plaintiff did not make timely Rule 26 disclosures or respond to discovery requests, requiring Court intervention. See, Minute Entry entered January 22, 2019 and [28].

3

14. After some difficulty in getting the deposition scheduled (see Motion [32] and Text Order entered October 17, 2019), Defendant was able to take the deposition of Dr. Chaikin on December 20, 2019. Exhibit 1 (transcript of deposition of Dr. Chaikin).

15. Dr. Chaikin had an episode of binge drinking in 2013 and called in sick for work, which resulted him being taken by Kathy Jaegle to IWIRC for a fit-for-duty exam and alcohol test, which was negative. Chaikin dep. at 23-24. Dr. Chaikin claims that medical staff questioned him about the incident later, and he told them that "I was doing that in Russian way, Russia habitual drinking to the point when -- there was a reason we drank, we drank to the point when there was an opportunity." Chaikin dep. at 26.

16. The medical director, Dr. Hawkins, told Chaikin privately in 2013 that he would be fired if he came to work drunk. Chaikin dep. at 28. In seven years at Methodist, Dr. Chaikin called in sick twice due to being drunk. Chaikin dep. at 29.

17. Dr. Chaikin received a DUI and was tasered by police in September 2015. Chaikin dep. at 40-41. He did not report the incident to Methodist at the time but disclosed it when renewing his hospital privileges in 2016. Chaikin dep. at 42, 44.

18. Dr. Chaikin did use alcohol and did so on a "random but binge episode basis," but was never under the influence at work. Chaikin dep. at 62.

19. Jeanette Murray spoke to Dr. Chaikin on June 12, 2017 regarding his behavior at a recent anesthesia group meeting and asked whether he was drinking, which Dr. Chaikin denied. Chaikin dep. at 59-63.

20. On Sunday, June 18, 2017, Dr. Chaikin was at home on Father's Day, not feeling well, using mouthwash, and having diarrhea. He called the chair of the anesthesia department, Dr. Costin, a "few times that night." Chaikin dep. at 71. He last called Dr. Costin at 5:00 a.m. to confirm that Dr. Costin obtained a substitute and that he did not have to come in to work on Monday. Chaikin dep. at 71.

21. Dr. Chaikin used Listerine mouthwash and claims that he did not know that the mouthwash was 45-56 proof (i.e. 22-28% alcohol). Chaikin dep. at 75-76. He testified that his dentist recommended it for dental pain. Chaikin dep. at 77. He would swallow it if there was no where to spit. Chaikin dep. at 78.

22. Dr. Chaikin claims that he lied to his psychiatrist when he reported drinking wine on Father's Day. Chaikin dep. at 79.

23. Dr. Chaikin did not go in to work at Methodist on Monday, June 19. Chaikin dep. at 71 ("I was off for entire Monday"). Dr. Gruber covered the open-heart surgery that Dr. Chaikin was scheduled to handle. Chaikin dep. at 86.

24. Around 9:00 p.m. on Monday, June 19, Dr. Costin called Dr. Chaikin and asked him to come in on Tuesday, June 20 and that they would "find something" for him to do. Chaikin dep. at 85. Dr. Costin asked if he could come in and do some "light work" and Dr. Chaikin reluctantly agreed. Chaikin dep. at 73.

25. On Tuesday, Dr. Chaikin's daughter dropped him off on the side of the hospital by the helipad and he went into the locker room and got changed. Chaikin dep. at 87.

26. Dr. Chaikin asserted that he did not intend to work on Tuesday (Chaikin dep. at 72, "didn't plan to come to work"), but that assertion is inconsistent with the facts: Dr. Costin asked Dr. Chaikin to come do light work and he agreed to do so, his daughter dropped him off rather than waiting for him as she did for meetings, he went to the locker room and changed, and then went to the assignment board. Work assignments may be listed on the assignment board or given by Dr. Costin. Chaikin dep. at 89.

27. Dr. Costin met Dr. Chaikin at the assignment board, then took him to Dr. Costin's office, where they were joined by Kathy Jaegle and Jane Thurmond, who took Dr. Chaikin to IWIRC for a fit-for-duty evaluation. Chaikin dep. at 94.

28. Dr. Chaikin took his mouthwash with him and used it "all the time". Chaikin dep. at 95. He does not recall how much he swallowed, but he used between one-third and one-half of an eight ounce bottle. Chaikin dep. at 78-79.

29. Dr. Chaikin was given two breathalyzer tests, which gave blood alcohol content (BAC) readings of 0.174% and 0.500%. Chaikin dep. at 96. A blood draw was done to test blood alcohol content. Chaikin dep. at 97. The blood test revealed a blood alcohol content of 106 mg/dl or 0.106%. Exhibit 2 (deposition of Ashley Droege) at 12-15.

30. Dr. Chaikin admitted, "Yeah, I was trying to hide something…" Chaikin dep. at 99.

31. Dr. Chaikin had a scheduled appointment with his psychiatrist on the afternoon of June 20 and was admitted after that appointment to the inpatient behavioral health

unit for six days. Chaikin dep. at 102. A few days after his discharge, Dr. Chaikin

traveled to Russia with his daughter for 10-14 days for a thirty-year reunion where he

drank on at least a couple of occasions which he described as "almost binge drinking."

Chaikin dep. at 104-105.

32. Dr. Chaikin had a meeting with Dr. Keith Knepp (Chief Operating Officer at the

time) on August 1. Chaikin dep. at 111.

33. Dr. Chaikin had a second meeting with Dr. Knepp on Friday, August 4. Chaikin

dep. at 113. Dr. Knepp advised Dr. Chaikin that they were terminating his employment

pursuant to the no-cause termination clause in his contract. Chaikin dep. at 116, 119. His

termination of employment was effective December 6, 2017. Chaikin dep. at 140.

Termination of employment is separate from termination of medical staff privileges.

Chaikin dep. at 140.

34. Dr. Chaikin acknowledged that his medical staff privileges were not revoked for

disciplinary reasons and that he received a letter acknowledging that he voluntarily

relinquished his privileges. Chaikin dep. at 9-10. Despite the letter, Dr. Chaikin denied

voluntarily giving up his privileges. Chaikin dep. at 140.

35. Defendant thereafter took the depositions of Dr. Dru Hauter, Ashley Droege, PA-

C, and Erika Grimm, DDS in August 2020. Notices to Take Deposition [42], [43], [44].

36. Ashley Droege was the PA who saw Dr. Chaikin at IWIRC. Droege dep. at 4, 9-

10. Dr. Chaikin's first breath alcohol was taken at 9:42 a.m. on June 20 at came back at

0174%. Droege dep. at 12. He would have been instructed not to eat or drink anything before the second breathalyzer test. Droege dep. at 12-13. The second test was 0.500%. Droege dep. at 13-14. A blood sample was taken, and his blood alcohol came back at 0.106%. Droege dep. at 14-15. PA Droege assessed Dr. Chaikin as having an altered mental status and that he was not qualified to return to work due to his alcohol level. Droege dep. at 23-24.

### Deposition of Kathy Jaegle on December 8, 2020

37. Kathy Jaegle was the Director of Compensation and Integration in the Human Resources Department and before that a Manager of Employee Relations. Exhibit 3 (deposition of Kathy Jaegle) at 13. Her deposition took place on the morning of December 8, 2020.

38. Human resources handled benefits and compensation but had nothing to do with physicians at the hospital who were not Methodist employees. Jaegle dep. at 18. She was not familiar with the medical staff bylaws. Jaegle dep. at 26.

39. The medical staff office and human resources for employees were separated "like church and state" and HR had nothing to do with the bylaws. Jaegle dep. at 28. That distinction seemed lost – whether genuinely or feigned – on Attorney Lavery.

40. Dr. Chaikin was a hospital employee. Jaegle dep. at 19.

41. Attorney Lavery asked her "And now did you find it alarming that the medical staff and the management would permit a -- I mean, a physician who had a DUI to be in

the operating room with people -- with cardiac surgeries without any alcohol or mental health monitoring? Are you alarmed at that?" Jaegle dep. at 33-34. After objections, Jaegle answered that she would have no knowledge that an employee had a DUI if it was unrelated to their job. Jaegle dep. at 35. Dr. Chaikin testified that he did not disclose the DUI to Methodist at the time.

42. Plaintiff's counsel persisted and asked "Would you want to be operated on if you knew the anesthesiologist had a DUI and just went to a few classes that the Court required and then was back in the operating room? Would you feel comfortable with that, personally?" Jaegle dep. at 36. Counsel objected that the question was argumentative and misstated facts (it is also irrelevant) but allowed Jaegle to answer that she would "probably not" be comfortable.

43. Attorney Lavery then asked Jaegle, "Do you realize that Methodist did know about the DUI?" Jaegle dep. at 36. While some staff at Methodist eventually became aware of the DUI, Dr. Chaikin admitted that he did not report it at the time. Chaikin dep. at 42, 44.

44. Plaintiff's counsel continued to badger Jaegle, an HR employee, about the impact of Dr. Chaikin's DUI on patient care. Jaegle dep. at 38-41. Plaintiff's counsel asserted that Jaegle was "forgetting about patient's safety" and "That's the level of patient care you get at Methodist…" Jaegle dep. at 38, 41. At that point, Undersigned Counsel

suggested involving the Court to address the questioning. Attorney Lavery agreed to "rephrase it and take the tone down" and the deposition moved on. Jaegle dep. at 41-42.

45. Kathy Jaegle testified that Methodist had a "zero tolerance policy" for alcohol in the workplace. Jaegle dep. at 51.

46. Jaegle also testified that she was not aware of any request by Dr. Chaikin to Dr. Knepp to receive treatment or return to Methodist after completing treatment. Jaegle dep. at 52.

### Deposition of Dr. Keith Knepp on December 8, 2020

47. Dr. Knepp's deposition started at 2:00 p.m. on December 8, 2020.

48. Although this is an employment case, rather than a patient care case, Plaintiff's counsel began the deposition by asking Dr. Knepp whether he was "aware of the Hippocratic Oath." Exhibit 4 (deposition of Dr. Keith Knepp) at 6.

49. In 2014, Dr. Knepp was the Chief Operating Officer (COO) and did not have direct involvement with medical staff issues. Knepp. dep. at 7-8.

50. Physicians who work in the hospital must "have privileges on the medical staff." Knepp. dep. at 8.

51. When he was on the medical staff, Dr. Knepp was in family practice and did not recall any clinical interactions with Dr. Chaikin, who was an anesthesiologist in the operating suites. Knepp. dep. at 14-15.

52. Dr. Knepp received a report on June 20 regarding Dr. Chaikin's apparent impairment at the hospital. Knepp dep. at 19-20, 36.

53. Dr. Knepp was advised of the results of Dr. Chaikin's fit for duty evaluation at IWIRC, including the breathalyzer and blood test results showing that he was intoxicated. Knepp dep. at 98 (discussed him coming to work intoxicated).

54. Dr. Knepp met with Dr. Chaikin on Tuesday August 1 [after Dr. Chaikin completed inpatient stay in behavioral health and took a trip to Russia for 10-14 days]. Knepp dep. at 49. At that meeting, Dr. Chaikin denied using alcohol or being intoxicated. *Id.* Dr. Chaikin claimed that he had been sober for two years. Knepp. dep. at 57.

55. Contrary to Dr. Chaikin's testimony, Dr. Knepp did not recall the meeting being interrupted or postponed for any reason. Knepp. dep. at 56. Dr. Knepp told him that he came with the intention to work and put the organization and patients at great risk. Knepp. dep. at 58.

56. Dr. Knepp met with Dr. Chaikin again on Friday, August 4 to advise Dr. Chaikin that they were terminating his employment pursuant to the no-cause termination clause of his contract. Knepp. dep. at 98-99.

57. Dr. Knepp felt that there was no reasonable chance that they would have confidence in him in the future. Knepp. dep. at 51.

58. Plaintiff's counsel questioned Dr. Knepp about the Practitioner Assistance Committee (PAC) established under the bylaws for medical staff. Knepp. dep. at 18. The PAC "exists to assist the medical staff in making decisions around members of the medical staff who might be impaired…" Knepp. dep. at 19.

59. Dr. Knepp informed the hospital's medical affairs office of the issue and does not know for certain whether the medical staff leadership involved the PAC. Knepp. dep. at 21-22. Attorney Lavery then confirmed that Dr. Knepp was involved in Dr. Chaikin's termination and asked "But you're telling me that" you were not aware whether the PAC evaluated the credibility of the complaint regarding Dr. Chaikin. Knepp. dep. at 22-23.

60. Plaintiff's counsel persisted in asking about programs and education provided by the PAC. Knepp. dep. at 23-27.

61. Plaintiff's counsel spent much, perhaps a majority, of the deposition asking about the PAC. See, Knepp. dep. at 18-19, 21-27, 34-39, 41, 45-50, 53-55, 68-70, 73, 81-83, 88-89, 94, 113, 132, 135.

62. The PAC is created by the medical staff bylaws and is under the jurisdiction of the Chief Medical Officer, not Dr. Knepp as COO. It had nothing to do with Dr. Knepp's termination of Dr. Chaikin's <u>employment</u> with Methodist. Dr. Knepp testified, "I made that determination based on Dr. Chaikin's status as an <u>employee</u> of Methodist, not based on his <u>medical staff</u> membership status." Knepp. dep. at 36 (emphasis added). He

pointed out again later in the deposition that the response depends upon whether the physician is "an employed physician… or… a completely independent member of the medical staff." Knepp. dep. at 90. Some of the physicians at the hospital, including some of the psychiatrists, are on the medical staff but are not employees of the hospital. Knepp. dep. at 71.

63. Plaintiff's counsel repeatedly asked about "reasonable accommodations" for Dr. Chaikin, even though the ADA accommodation claim was dismissed, making the issue of "reasonable accommodation" irrelevant. See, Knepp. dep. at 68-69, 70, 91-93. Whether the hospital was required to provide an accommodation is not an issue in the case.

64. Plaintiff's counsel acknowledged that Dr. Knepp was a medical doctor (Knepp. dep. at 27), but nevertheless asked repeatedly whether he was a doctor. Knepp. dep. at 13, 28, 63, 106.

65. Counsel repeatedly asked for medical opinions regarding Dr. Chaikin even though Dr. Knepp was not Chaikin's treating physician and was not disclosed as a medical expert. See e.g., Knepp. dep. at 27-28, 31, 105, 106.

66. Dr. Gary Knepp was the Chief Medical Officer and is Dr. Gary Knepp's father. Knepp. dep. at 41. Plaintiff's counsel suggested that they take a break in the deposition so the deponent could call Dr. Gary Knepp to "refresh his recollection," but then moved on. Knepp. dep. at 42.

67. Plaintiff's counsel then asserted that Dr. Knepp "didn't completely involve the management team" (Knepp. dep. at 43), again by ignorance or feigned ignorance misunderstanding the difference between the hospital management (where Dr. Keith Knepp was COO) and the medical staff hierarchy (where Dr. Gary Knepp was Chief Medical Officer).

68. Plaintiff's counsel spent a great deal of time referencing or asking about Dr. Chaikin's DUI in 2013. Knepp. dep. at 59-61, 76, 113, 116. Dr. Knepp could not recall being aware of the 2013 DUI prior to meeting with Dr. Chaikin on August 1 and was not aware of the details of the incident. Knepp. dep. at 60-62.

69. Plaintiff's counsel argued and tried to get Dr. Knepp to admit that the lack of institutional knowledge regarding the DUI (which he insisted that the hospital knew everything about) was a "system failure" at Methodist. Knepp. dep. at 60-62. This again has nothing to do with any of the claims in the case, which have to do with whether Dr. Chaikin was lawfully terminated in 2017.

70. Plaintiff's counsel repeatedly argued, without evidence, that "the hospital knew about all of this" regarding the facts of Dr. Chaikin's DUI, tasering, and arrest (Knepp. dep. at 61-62) despite the fact that Dr. Chaikin himself testified that he did not disclose it to the hospital until 2016 and Dr. Knepp testified that he was not aware of it. Moreover, it is not relevant to Dr. Chaikin's termination in 2017.

71. Plaintiff's counsel repeatedly asked about Dr. Chaikin's denial of drinking at the August 1 meeting and whether denial was or could be a symptom of alcohol use disorder. Knepp. dep. at 63, 68-69, 72, 102, 105-107.

72. Dr. Knepp testified that he did not ask Dr. Chaikin about his mental health care, but Plaintiff's counsel repeatedly asked whether he made that inquiry to Dr. Chaikin. Knepp. dep. at 11-12, 63-65, 80,

73. Dr. Knepp testified that Dr. Chaikin did not ask for accommodation, treatment, referral or help, but Plaintiff's counsel asked the question repeatedly despite the clear denial. See e.g. Knepp. dep. at 130-132.

74. Even after Dr. Knepp clearly testified that he did not refer Dr. Chaikin to the PAC or for any treatment in addition to the psychiatric treatment he was already receiving, Attorney Lavery repeatedly asked whether Dr. Knepp referred him. Knepp. dep. at 68, 69.

75. Attorney Lavery again referenced the Hippocratic oath, even though Dr. Chaikin was not his patient, and tried to get Dr. Knepp to go along with his theory by prefacing his question with, "I'm not going to use this… I'm just asking you honestly…" Knepp. dep. at 81. If the answer is not to be used, it is irrelevant and improper. Dr. Knepp pointed out correctly that Dr. Chaikin was already receiving psychiatric care. Knepp. dep. at 82 and at 71, 102, 104, 110, 131, 132.

76. Attorney Lavery implied that Dr. Knepp was not being honest, tell him "we can get done a lot soon if you can honestly answer…" Knepp. dep. at 83. The interrogation at this point was clearly improper and bullying:

I'd -- I'd -- I'd like you to -- we can get done a lot sooner if you can honestly answer this question, Doctor, because there's a lot of documents in this case that involve patient care and decisions your hospital made.

We can go through those documents and show that -- you know -- the hospital was well aware and endangered patients because it never offered to get Dr. Chaikin help. It never tried to monitor him, and I think you know what the best practices are.

Or you can just -- you know -- concede and maybe we can even wrap this up after this deposition is opened. You can concede as just an honest man and a doctor who has followed the Hippocratic Oath. Okay? This reality.

Knepp. dep. at 83-84.

77. Dr. Knepp testified that he did not know that Dr. Chaikin was Russian but could tell from his accent that he was not originally from the United States. Knepp. dep. at 96. Attorney Lavery repeated the question two more times, asking indignantly "You worked with this guy for seven years and you just never heard that -- what country he emigrated from, never?" Knepp. dep. at 97. Dr. Knepp previously testified that they did not work together clinically and could not recall whether they met prior to the events in 2017.

78. Dr. Knepp understood that he was required to report Dr. Chaikin to the Physician Disciplinary Board. Knepp. dep. at 99 ("obligated to report").

16

79. Attorney Lavery resumed asking about whether treatment was sought for Dr. Chaikin and then asked "so instead of offering him treatment in response to that system, you punished him with the report to the disciplinary board, correct?" Knepp. dep. at 102. Counsel objected to the question, which was inappropriate in at least two respects:  it assumed that he was not offered treatment when he was in fact already receiving treatment from a psychiatrist and in asserting that the report to the disciplinary board was "punishment" by Dr. Knepp, who already testified that it was a mandatory report. Knepp. dep. at 99.

80. Dr. Knepp was asked repeatedly about whether the report was "punishment", which he denied, and explained repeatedly that it was a mandatory report. Knepp. dep. at 104 ("requirement for us to do so"), 107 ("legal requirement"), 110 ("required to report") 111 ("followed the advice… to follow the law"), 114 ("obligated to report"),

81. Plaintiff then accused Dr. Knepp, asserting that he "didn't follow the law" because he did not refer him to the PAC and "denied him the right" to treatment. Knepp. dep. at 112. Dr. Knepp correctly disagreed. *Id*. The question was improper because it was repetitive of prior questions, argumentative, and based upon untrue statements. The PAC has to do with medical staff privileges, not employment. The bylaws create a committee. They are not "law" and do not create any individual "rights." The bylaws set forth the responsibilities of the Committee, nothing more. Exhibit 5 (Bylaws exhibit used at Dr. Knepp's deposition).

82. Attorney Langone repeatedly accused Dr. Knepp of retaliating. While retaliation is a relevant issue, the questions were repetitive and became argumentative. Knepp. dep. at 114, 115, 130, 131, 135.

83. The final question which led to termination of the deposition was argumentative, repetitive, and includes the assertion of a "right" that does not exist:

> So it was easier for you to just retaliate and use the no-cause termination than use the Physician Assistance Committee. Your retaliation -- Strike that.

> You retaliated by choosing to report him to a disciplinary board rather than affording him his right to the Physician Assistance Committee?

> Knepp. dep. at 135.

84. Essentially same question was asked at Knepp. dep. at 114, 115, 130, 131. Dr. Knepp testified at length and repeatedly that Dr. Chaikin was terminated because he showed up to work under the influence and denied drinking.

85. Attorney Langone repeatedly represented that Dr. Chaikin's daughter came with him on June 20 because he did not intend to work. Knepp. dep. at 116, 117, 118-119, 121. However, Dr. Chaikin himself testified that his daughter dropped him off and that he was coming in to do "light work" at the request of Dr. Costin.

86. Attorney Langone asserted that Dr. Chaikin was told to come to work in the morning when he called in to take the day off. Knepp. dep. at 119. As Dr. Chaikin testified, this was not true. He was allowed to take Monday off and asked to come in on Tuesday.

87. Attorney Langone argued with Dr. Knepp about whether Dr. Chaikin intended to work on Tuesday and then asserted, "So there's no dispute. He was not there for work." Knepp. dep. at 120, 122-124. He argued that "We all know he wasn't there to work…. Everybody knows that there's no way he was showing up for work." Knepp. dep. at 116. Those assertions were not true, even based upon his own client's testimony. Dr. Knepp testified repeatedly that it was his understanding that Dr. Chaikin came in to work. Knepp. dep. at 20-21, 58, 98, 117, 125-126.

88. Plaintiff asserted that he now had "different facts" and that Dr. Chaikin "denies he was showing up for work and that Dr. Costin actually expressed that he was going to help him and coming in for help with his daughter…" Knepp. dep. at 124-125. All of these facts were untrue. Dr. Costin has not been deposed, so he has not expressed anything. As noted above, even Dr. Chaikin admits that he was coming to work and that his daughter did not come up to meet with Dr. Costin but dropped him off by the helipad.

89. Counsel repeated these inaccurate assertions and then asked argumentatively, "No one thought it would be good to take immediate action to help the old Russian drunk, did they?" Knepp. dep. at 128. That question, in less abrasive form, had already been answered several times.

90. Attorney Lavery accused Dr. Knepp of "playing games" and asserted, "I've done my research." Knepp. dep. at 129.

91. Attorney Langone's demeanor became increasingly abrasive and indignant as the deposition wore on. He would throw himself back in his chair in disbelief or lean into the camera.

## Post-Deposition Conduct and Pleadings

92. While the bare transcript does not give the full flavor of Attorney Lavery's argumentative and bullying tactics, his subsequent actions do. The deposition concluded just after 5:00 p.m. Plaintiff followed up his misconduct at the deposition with emails falsely accusing Defendant's counsel of misconduct. Exhibit 6 (email string).

93. Undersigned sent an email at 6:54 p.m. canceling the deposition of Jeanette Murray, which was scheduled for the following day, pending guidance from the Court. Exhibit 5 at 13.

94. Attorney Lavery responded at 7:05 p.m. requesting a "Rule 37 conference" and asserting that termination of the deposition "violates the rules." Exhibit 5 at 12. To the contrary, Seventh Circuit precedent requires that counsel terminate a deposition and seek court intervention rather than use self-help such as instructing witnesses not to answer questions. *Redwood v. Dobson*, 476 F.3d 462, 467–68 (7th Cir. 2007).

95. Attorney Langone emailed at 7:23 p.m. asserting that termination was not appropriate and that they intended to proceed with Jeanette Murray's deposition. Exhibit 5 at 11.

96. Attorney Lavery emailed again at 8:00 p.m. that he was continuing to prepare for the canceled deposition and would seek fees for his preparation time. Exhibit 5 at 10. The Undersigned responded at 8:05 p.m. that the deposition would not proceed.

97. Attorney Lavery sent a lengthy email at 12:51 a.m. that night threatening to file a Rule 11 motion if Undersigned proceeded with a motion for protective order and that such a motion would be "frivolous." Exhibit 5 at 7.

98. Attorney Lavery filed Motion to Amend the Complaint [47] at 3:00 a.m.

99. Undersigned received the 12:51 a.m. email in the morning and responded at 7:58 a.m. that he was standing by the decision to cancel the deposition of Jeanette Murray and filing a motion for protective order, as the *Redwood* decision directs.

100.    Undersigned counsel filed a brief motion at 8:40 a.m. requesting a discovery hearing with the Court.

101.    Attorney Lavery filed his first Emergency Motion to Compel [49] at 9:12 a.m. Among other assertions, the motion accused counsel of "formulating an attempt to gaslight the Court and make false allegations against Undersigned Counsel as a vexatious defense tactic." Emergency Motion to Compel [49] at 1. He then accused counsel of "defamatory assertions against undersigned Counsel to gain an advantage in this litigation." *Id.* He went on to assert that "Mr. Jennetten's current strategy is to deny the search for the truth and make false allegations against Undersigned Counsel." *Id.* at 2. He concluded the motion with the baseless assertion that "Mr. Jennetten" would use

his "powerful family" and "prestigious Peoria law firm" to bolster his attack on Plaintiff's counsel, who is from the Northern District. *Id.*

102.    Attorney Langone emailed again at 9:34 a.m. accusing the undersigned of "misconduct," attached a draft motion for Rule 11 sanctions and asserted that they intended to proceed with Murray's deposition. Exhibit 5 at 5. Undersigned responded at 9:46 that he would not "present anyone for deposition until we have an opportunity to address this with the Court." Exhibit 5 at 4. Attorney Langone responded at 9:57 that he expected us to be on Zoom for the deposition at 10:00 and Undersigned responded immediately that he would not be attending. Exhibit 5 at 2-3.

103.    The Court entered an order at 10:49 a.m. setting a hearing for 1:30 p.m. that day.

104.    Attorney Lavery sent another lengthy diatribe at 10:49 a.m. accusing Undersigned of "being unprofessional" and instructing counsel to "Stop the gaslighting." Exhibit 5 at 2.

105.    At 10:53, Attorney Lavery called and left a voicemail for Undersigned stating that he was leaving a voicemail so that he could put in his motion that he called.

106.    Attorney Lavery then filed a second "Emergency Motion to Compel" at 12:26 p.m., shortly before the hearing. The motion correctly asserted that the Undersigned refused to accept his calls that morning, a result which should not have been unexpected given the unfounded allegations made in his emails and motions.

107.    Attorney Lavery left another message at 1:07 p.m. asserting that he wanted to discuss the case, "I don't know what your problem is," and asking that we discuss and allow the deposition to go forward.

108.    The Court held the hearing at 1:30 and granted the parties leave to file motions within 14 days.

109.    There was no requirement for a "Rule 37" conference. *Redwood* does not require it. The objections were stated and discussed on the record. Plaintiff's voicemail messages and emails made clear that they admitted no fault and felt that Attorney Lavery's conduct was entirely appropriate. Any such conference would have been futile.

110.    Counsel spoke with Attorney Lavery's co-counsel, Chris Langone on December 21 in response to a voicemail left by him. Attorney Langone again reiterated their belief that Attorney Lavery did not do anything wrong, noting they did not call people names or discuss sexual conduct. Langone indicated that he reviewed the deposition and found the questioning "tame."

111.    Attorney Lavery's examination was clearly out of bounds. The assertions by both Attorney Lavery and Attorney Langone that the questioning was proper make clear that any Rule 37 conference would have been and was futile.

112.    The Court should strike the depositions of Dr. Knepp and Kathy Jaegle taken by Plaintiff and bar Plaintiff from using those depositions for any purpose.

113.    The Court should prohibit Plaintiff from any further deposition of Dr. Knepp.

114.    The Court should prohibit Plaintiff from deposing any other witnesses.

115.    The Court should prohibit Plaintiff's current counsel from participating in any further depositions.

116.    This case is over two years old already and Plaintiff has done little to prosecute it. Their delay and misconduct should not be rewarded.

117.    If any further depositions by Plaitniff are allowed, they should be done under court supervision.

118.    The Court can and should award fees pursuant to Fed. R. Civ. P. 30 and 37, 28 U.S.C. §1927, and the Court's inherent authority.

WHEREFORE, the Defendant, THE METHODIST MEDICAL CENTER OF ILLINOIS, that the Court enter an order granting this motion, striking the depositions taken by Plaintiff and prohibiting Plaintiff from using them in this litigation, terminating the deposition of Dr. Knepp and barring further interrogation of Dr. Knepp, barring Plaintiff from taking any further depositions, requiring that any further depositions by Plaintiff's counsel be supervised by the Court, imposing monetary sanctions upon Plaintiff's counsel including the cost of filing and litigating this motion, and for such other and further relief as the Court deems just.

THE METHODIST MEDICAL CENTER OF
ILLINOIS, Defendant


By:    *s/Peter R. Jennetten*
       QUINN JOHNSTON


Peter R. Jennetten (Illinois Bar No. 6237377)
pjennetten@quinnjohnston.com
Adam P. Chaddock (Illinois Bar No. 6274685)
achaddock@quinnjohnston.com
James D. VanRheeden (Illinois Bar No. 6321658)
jvanrheeden@quinnjohnston.com
QUINN JOHNSTON
227 N.E. Jefferson Ave.
Peoria, IL  61602-1211
(309) 674-1133 (phone)
(309) 674-6503 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2020, I electronically filed this Motion for Protective Order with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Christopher V. Langone
Langonelaw@gmail.com


Mark T. Lavery
laverylawyer@gmail.com


*s/Peter R. Jennetten*
Peter R. Jennetten (Illinois Bar No. 6237377)
pjennetten@quinnjohnston.com
QUINN JOHNSTON
227 N.E. Jefferson Ave.
Peoria, IL 61602-1211
(309) 674-1133 (phone)
(309) 674-6503 (fax)

4831-8847-9856, v. 1

26